929 A.2d 899

**PEOPLE'S COUNSEL FOR BALTIMORE COUNTY, et al.**

v.

**Dorothy SURINA, et al.**

**No. 111 Sept. Term, 2006.**

Court of Appeals of Maryland.

Aug. 23, 2007.

666

Peter Max Zimmerman, People's Counsel for Baltimore County (Carole S. Demilio, Deputy People's Counsel; J. Carroll Holzer, Holzer & Lee, P.A., Towson, MD), all on brief, for Petitioners.

Howard L. Alderman, Jr. (Randolph C. Knepper of Levin & Gann, P.A., Towson, MD), on brief, for Respondents.

ARGUED BEFORE BELL, C.J., RAKER, CATHELL,*
HARRELL, BATTAGLIA, GREENE, and ALAN M.
WILNER (Retired, specially assigned), JJ.

HARRELL, Judge.

We are asked in this litigation to determine whether a proposed stormwater management ("SWM") facility and private residential access road, the former designed primarily to serve new single-family residential construction on lots in Baltimore County's R.C. 5 (Rural–Residential) zone and the latter serving those lots and a lot in the R.C. 2 (Rural–Agricultural) zone, both may be placed on the R.C. 2 zoned portion of the split-zoned tract. The Baltimore County Zoning Commissioner and Board of Appeals approved the proposed development. The Circuit Court for Baltimore County, on judicial review of that action filed by neighbors of the proposed development, reversed, holding that placement of the SWM facility on the R.C. 2 portion of the development violated existing zoning regulations. The Circuit Court, however, found no zoning problem with regard to the access road. The Court of Special Appeals, in an unreported opinion, reversed-in-part and affirmed-in-part the judgment of the Circuit Court, holding that there existed "no zoning impediments" whatsoever to the development plan. We shall affirm, but for reasons different than those relied on by the Court of Special Appeals.

## BACKGROUND INFORMATION

The basic facts underlying the present case are as follows, divergent inferences advocated by the parties aside. The controversy arises from a development plan submitted to Baltimore County by Respondents, Dorothy Surina and Jeanne Gough (the land owners) and Gaylord Brooks Realty

---

* Cathell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Company (the developer). The development project, identified as "Lynch Property—Sweet Air Road," is proposed for a 47 acre tract of land located near the intersection of Sweet Air Road and Manor Knoll Court, east of Jacksonville, a rural area in the northeastern portion of Baltimore County (the "Property"). Under the "Rural Protection and Resource Conservation" ("R.C.") area zoning in the County, Baltimore County Zoning Regulations ("BCZR") § § 1A00.1–1A09.8, the Property and immediately adjacent parcels of land [1] are subject to various development requirements aimed at agricultural, watershed, critical area, and rural resource preservation.[2] The Property is divided by Sweet Air Road, a public road which runs in an east-west direction. Approximately 32.3 acres of the Property is located south of Sweet Air Road. The remaining 14.7 acres is located to the north. The portion lying to the south of Sweet Air Road is zoned, in its entirety, in the R.C. 2 zone under the Zoning Regulations, *see* BCZR §§ 1A01.1–1A01.4, and is improved with an existing residential structure.[3] The part of the Property located to the north of Sweet Air Road is split-zoned, meaning that there exists multiple zoning boundaries within that portion. *Alviani v.*

---

**1.** The Gunpowder State Park borders the Property immediately to the north and east. The record indicates further that, to the west, there is a R.C. 5 zoned residential community consisting of twenty to thirty single-family dwellings.

**2.** The County's generally stated purposes in establishing the resource conservation zones are as follows: (1) to discourage the current patterns of development in rural areas; (2) to "[p]rovide sufficient and adequate areas for rural-suburban and related development in selected and suitable areas;" (3) to "[p]rotect both natural and man-made resources from compromising effects of specific forms and densities of development;" (4) to "[p]rotect areas desirable for more intensive future development by regulating undesirable forms of development within these areas until such time as intensive development commences[;]" and (5) to "[h]elp achieve the goals of the Chesapeake Bay Critical Area Protection Law by enacting land use policies to control development within the Critical Area by conserving the land and water resource base for agriculture, forestry and other natural resource uses; minimizing adverse effects on water quality; and conserving fish, wildlife and plant habitat." BCZR § 1A00.2.

**3.** The mailing address of the existing dwelling is 4501 Sweet Air Road.

*Dixon,* 365 Md. 95, 100 n. 2, 775 A.2d 1234, 1236 n. 2 (2001). On the west side of the northern parcel are 10.8 acres of R.C. 5 zoned land.[4] There are two smaller areas on the eastern section of the northern portion of the Property, collectively shaped like a wedge and approximately 3.9 acres in size, zoned R.C. 2.[5] The development plan proposes eight single-family dwelling lots for the entire Property. Specifically, the proposal provides for the development of six new homes predominantly within the R.C. 5 zone,[6] one new dwelling on the northeasterly wedge-shaped R.C. 2 zoned parcel,[7] and the retention of the existing dwelling located at 4501 Sweet Air Road.

## 1. Private Access Road

Part of the infrastructure proposed in support of the subdivision, to be located on the part of the Property north of Sweet Air Road, fuels the instant controversy. Vehicular access to the lots, according to the development plan, is to be provided by a private road leading from Sweet Air Road into the interior of the R.C. 5 zoned land. The access road enters the proposed subdivision in the R.C. 5 zone, crosses briefly into the R.C. 2 zone, and then back into the R.C. 5 zone, where it eventually terminates in a cul-de-sac. The road is intended to provide owners of the R.C. 2 lot and the otherwise land-

---

**4.** As we will describe *infra,* R.C. 5 land is categorized as rural-residential. The general regulations governing development in this zone are found at BCZR §§ 1A04.1–1A04.4.

**5.** R.C. 2 is categorized as a rural-agricultural zone. The regulations governing the permissible uses of R.C. 2 zoned land are located at BCZR §§ 1A01.1–1A01.4.

**6.** Five of the six lots comprised exclusively of R.C. 5 zoned land are each approximately 1.5 acres in size. The sixth lot, although predominantly in the R.C. 5 zone, is 4 acres, but contains a small portion of R.C. 2 zoned land. The R.C. 2 portion of the sixth lot is not computed towards density for the overall tract or needed to satisfy minimum lot size or any other requirements applicable to the R.C. 5 zone for the sixth lot.

**7.** The plan proposes in the R.C. 2 zone the construction of one single-family home on a 1.27 acre lot.

locked R.C. 5 zoned lots with access to Sweet Air Road. The design and location of the interior access road follows generally the existing natural topography of the Property.

## 2. Stormwater Management Facility

Also at issue is the placement of a stormwater management ("SWM") facility on the R.C. 2 zoned section of the Property which, according to the record, is intended to accommodate stormwater runoff from the R.C. 5 lots and surrounding areas.[8] The SWM facility is proposed to be located entirely within the R.C. 2 zoned land, adjacent to the private access road.[9]

Section 4–204 of the Environment Article of the Maryland Code (1982, 2007 Repl.Vol.) provides that all counties in Maryland shall adopt laws to implement a comprehensive stormwater management program.[10] Pursuant to this mandate, Balti-

---

**8.** Before the Zoning Commissioner and Board of Appeals, there was some disagreement as to the utility of placing the SWM facility where it was proposed by the developer. As we will discuss *infra*, although there was evidence presented that the runoff created by the R.C. 2 lot would not drain naturally into the SWM facility as sited, there was additional testimony proffered indicating that movement of the facility across the zoning boundary into the R.C. 5 zone would result in increased runoff onto the R.C. 2 lot and neighboring parcels. The reason given for this was that the proposed location of the SWM facility was positioned at the lowest-lying spot in the development area. Moving the facility into the R.C. 5 lot would therefore require moving the facility upgrade.

**9.** As the intermediate appellate court noted,

[t]he Lynch Property sits on a low ridge, so that storm drainage is currently off the property toward adjacent neighbors. Development plans show that the proposed SWM facility "shall be public" and located entirely in the R.C. 2 zone at a site that is lower than the R.C. 5 zoned land in the parcel. The proposed SWM site is situated where the R.C. 5 property will drain into it, rather than onto the neighboring property. Plans state that the SWM reservation area will "be dedicated and granted at no cost to Baltimore County."

**10.** The term "stormwater management" may refer to a system of either quantitative or qualitative controls. "Quantitative control" refers to a stormwater system or abatement practice that manages "the increased volume and rate of surface stormwater runoff caused by man-made changes to the land." Baltimore County Code § 33–4–101(ff)(1). Qua-

more County adopted a regulatory scheme which provides generally that, unless the proposed development qualifies under one of the enumerated exceptions in Baltimore County Code § 33–4–104(b), no proposed land development in the County may commence unless the developer/landowner obtains from the local government approval of a stormwater management plan. The exceptions to this requirement are: "(1) Agricultural land management practices; (2) Additions or modifications to existing single-family, detached, or semidetached residential structures, if the additions or modifications [do not disturb more than 5,000 square feet of land area]; (3) Developments that do not disturb more than 5,000 square feet of land area; and (4) Land development activities that the administration determines will be regulated under specific state laws which provide stormwater management no less stringent than the provisions of this title.". *See also* Baltimore County Code §§ 32–6–107 (providing that no building permit may issue unless the applicant first meets the requirements of Article 33, Title 4 of the Baltimore County Code [11] as well as § 32–4–410(c) [12] of that same Code). None of the exceptions apply to the subject development plan.

Stormwater management facilities may be located either on a proposed development site or off-site. If a facility is considered "on-site," it is intended to control stormwater runoff originating from within the site upon which the facility is located. Baltimore County Code § 33–4–101(v). An "off-site"

---

litative controls refer to a system that regulates water quality by eliminating pollutants, contaminants, or other particulate matter contained in the stormwater runoff which originates from particular development site(s). Baltimore County Code § 33–4–101(ff)(2).

**11.** Article 33, tit. 4, § 33–4–101 to 33–4–116 covers, in depth, the requirements and design standards for construction of stormwater management facilities in the County.

**12.** Section 32–4–410(c)(2) provides that "[p]roposed drainage facilities shall be adequate to accommodate the amount of runoff that would be generated by: (i) The proposed development; and (ii) The entire upstream area, if the area were fully developed in accordance with the Baltimore County Zoning Regulations in effect at the time of the design or construction."

facility, on the other hand, is intended to collect stormwater runoff from more than one site. Baltimore County Code § 33–4–101(v). "Site" is broadly defined by the Baltimore County Code and refers to "any tract, lot, or parcel of land, *or combination of tracts, lots, or parcels of land, that are in one ownership,* or are contiguous and in diverse ownership, *where development is to be done as part of a unit, subdivision, or project. . . .* " Baltimore County Code § 33–4–101(dd) (emphasis added).

As part of a proposed development plan, a SWM facility may also be designated for public or private maintenance. Baltimore County Code § 33–4–110. If designated for public maintenance, "[t]he county shall take in-fee ownership of the stormwater management devices and practices. . . ." Baltimore County Code § 33–4–110(1). If the facility is designated for private maintenance, however, the property owner (or its successor) is responsible for maintaining the facility in accordance with standards spelled out by the County "in a recorded deed of declaration for maintenance and access." Baltimore County Code § 33–4–110(2). To that end, the Baltimore County Code defines "public improvements" as those "improvements [which are] required by the county as a condition of development *that are intended to be dedicated to the county in fee simple or by other interests in title."* Baltimore County Code § 32–4–101(nn) (emphasis added). "Private improvements," on the other hand, are those improvements which are "required by the county as a condition of development that are *not intended to be dedicated* to the county." Baltimore County Code § 33–4–101(mm) (emphasis added). *See also* Baltimore County Code § 32–4–302(c) ("The applicant shall prepare, execute, and deliver to the county those improvements . . . required to convey to the county all rights-of-way *that are determined to be necessary and appropriate for the county to accept and maintain the public improvements."*) (emphasis added). As indicated on the approved development proposal, the stormwater management facility in the present case is

intended to be conveyed by the Respondents in-fee to the County for public maintenance.[13]

The present case began at the Zoning Commissioner / Hearing Officer (Commissioner) level when Respondents filed with the County a concept plan for the Property, pursuant to Baltimore County Code § 32–4–213. The concept plan included a simple, clean, and straight-forward schematic representation of the proposed subdivision. The review process continued according to § 32–4–216 [14] with the scheduling and completion of a Concept Plan Conference between the Department of Permits and Development Management, the Department of Environmental Protection and Resource Management, the Office of Planning, and the applicants. Subsequent to that meeting, a § 32–4–217 Community Input Meeting [15] was conducted, at which time, the owners of neighboring properties were given the opportunity to review and offer comments on the proposed development. After consideration and incorporation of the suggestions proposed during the earlier phases of the development approval process, the developers submitted a Development Plan for review and comments by the County at a Development Plan Conference.

---

**13.** Specifically, the development plan indicates that the SWM facility is intended by the developers to be constructed at Respondents' expense and granted in-fee to the County upon completion and approval by the Baltimore County Department of Environmental Protection and Resource Management that the facility was constructed in accordance with the County's SWM design requirements.

**14.** Baltimore County Code § 32–4–216(a), in pertinent part, provides that "[w]ithin 10 working days following the filing of a concept plan, the Department of Permits and Development Management shall hold a concept plan conference with the applicant and representatives from the Department of Environmental Protection and Resource Management, the Office of Planning, the Department of Permits and Development Management, and other appropriate agencies, to receive the comments of the agencies."

**15.** According to the Code, a Community Input Meeting should be conducted within 10 working days after the concept plan conference. At this meeting the developer and the surrounding community may discuss and resolve "community concerns and developer constraints" in terms of zoning issues. Baltimore County Code § 32–3–217(a), (b).

Baltimore County Code § § 32–4–221 to 32–4–226.[16] Subsequent to the Development Plan Conference, a quasi-judicial public hearing was scheduled before the Commissioner. Baltimore County Code § 32–4–227.[17]

The Long Green Valley Community Association, and three individuals, Charlotte Pine, Steve Preston, and Gary Elser, at some point prior to this hearing, filed with the Commissioner a Petition for Special Hearing pursuant to BCZR § 500.7.[18] It was at the § 32–4–227 public hearing that counsel for the

---

**16.** The Development Plan essentially is a final proposed plan which incorporates the suggestions and resolutions to issues which arose during the earlier concept phases of the process. The applicant may not file a Development Plan without first holding a community input meeting regarding the proposed development. Baltimore County Code § 32–4–221(a).

**17.** Baltimore County Code § 32–4–227 provides that "final action on a Development Plan may not be taken until after a public quasi-judicial hearing before a Hearing Officer."

**18.** BCZR § 500.7, in pertinent part, provides:

The said Zoning Commissioner shall have the power to conduct such other hearings and pass such orders thereon as shall, in his discretion, be necessary for the proper enforcement of all zoning regulations, subject to the right of appeal to the County Board of Appeals as hereinafter provided. *The power given hereunder shall include the right of any interested person to petition the Zoning Commissioner for a public hearing after advertisement and notice to determine the existence of any purported nonconforming use on any premises or to determine any rights whatsoever of such person in any property in Baltimore County insofar as they are affected by these regulations.*

(emphasis added). The issues framed for the Special Hearing were as follows:

1) Is a road that supports R.C. 5 residential development permitted within an R.C. 2 zone; 2) Is a storm water management facility that solely supports R.C. 5 development permitted within an R.C. 2 zone; 3) Can the R.C. 2 zone on the north and south sides of Sweet Air Road support both proposed Lots 6 and 7; 4) Can the density of an R.C. 2 zone parcel on the north and south sides of Sweet Air Road support Lots 6 and 7 along with the storm water management facility, and Lot 8 on the south side of Sweet Air Road; 5) Whether the creation of non-density parcels as part of residential lots shown on a development plan require a separate special hearing request, and specifically, a portion of proposed Lot 7 in the R.C. 2 zone; and, 6) such other and further issues as may be developed by the testimony presented at the hearing.

neighbors advised the Commissioner that the petition had been filed. Pursuant to Baltimore County Code, § 32–4–230(a), "[i]f the Development Plan requires a special exception, variance, special hearing, or interpretation of the Baltimore County Zoning Regulations, the applicant may combine the public hearing required under Title 3, Subtitle 3 of this article and under the Baltimore County Zoning Regulations with the public hearing held by the Hearing Officer on the Development Plan." The applicants consented to a single public hearing, which was held on 2 December 2003. The Commissioner filed on 16 December 2003 an opinion and order approving Respondents' development plan, pending the outcome of a traffic study aimed at determining if there existed a safe sight distance at the intersection of the interior access road and Sweet Air Road. Subsequent to receipt of that study, Respondents filed a red-lined development plan incorporating necessary changes indicated by the traffic study. The amended development plan was approved on 3 June 2004 by the Commissioner.

Petitioners noted with the Board of Appeals ("CBA") a timely administrative appeal. The CBA heard the matter on 7 September 2004. After the submission of legal memoranda from the parties and open deliberation on 26 October 2004 regarding the issues presented by the Petition for Special hearing, the CBA rendered its final decision on 10 November 2004, affirming the Commissioner's decision to approve the amended Development Plan. The Long Green Valley Community Association and the People's Counsel for Baltimore County filed on 6 December 2004 a Petition for Judicial Review in the Circuit Court for Baltimore County.

The Circuit Court reversed the decision of the CBA, concluding that the SWM facility contemplated by the development plan violated Baltimore County's resource conservation zoning regulations. Specifically, the Circuit Court held that, even though the facility was to be conveyed to and maintained by the County, the SWM system, by virtue of the fact that the need for stormwater management at all was precipitated by and served only the new development, was not a "public

facility." In other words, the Circuit Court found that presumed government ownership and maintenance of the facility was insufficient indicia that the SWM facility would be a "public improvement," where the facility was required by and served only the proposed subdivision.

The Circuit Court rejected the developer's argument that the SWM pond constituted, pursuant to BCZR § 101, an "uncontrolled excavation," and, therefore, a permitted accessory use, in the R.C. 2 zone. The Circuit Court concluded that "a permitted principal use [such as housing] in one zone cannot be served by [an] accessory use[,] [the SWM facility], if that accessory use is located in a separate zone having its own, specific regulations."

As to the access road, the Circuit Court found that the development plan approved by the Zoning Commissioner "show[ed] only a small piece of the roadway that extends through the R.C. 2 zone, as most of the road is located in the R.C. 5 zone. Clearly, the access road [ ] serv[ed] both the R.C. 2 and R.C. 5 zones separately, and this type of road [wa]s a use permitted by right in each zone according to BCZR § 1A01.2B.5 and § 1A04.2A.7." The Circuit Court reasoned further that "there is no requirement in the BCZR that requires a street or way in one particular zone to provide access to that zone only. Stated differently, each zone is supported by that part of the access road through which it travels, and it is therefore not in violation of the BCZR."

Respondents here noted a timely appeal with the Court of Special Appeals, raising the following issues:

(1) Did the Circuit Court substitute improperly its judgment for the County Board of Appeals in ruling that a stormwater management facility, an improvement required as part of the development approval for a split-zoned residential subdivision, is prohibited in a portion of the R.C. 2 zoned area of the subject property?

(2) Does the spirit, intent and scope of the BCZR prohibit the location of the SWM facility in a portion of the R.C. 2 zoned area of the subject property?

(3) Did the County Board of Appeals apply the correct law and is its written opinion supported by substantial evidence?

The Court of Special Appeals, in an unreported opinion, agreed with the Commissioner and the CBA "that the proposed SWM facility is a public facility that is exempt from [the] R.C. 2 zoning restrictions [established in the BCZR]." Relying on our holding in *Glascock v. Baltimore County,* 321 Md. 118, 581 A.2d 822 (1990) (" '[I]t is a basic long-standing principle of statutory construction that the State is not deemed to be bound by an enactment of the General Assembly unless the enactment specifically names the State or manifests a clear and indisputable intention that the State is to be bound.' ") (citations omitted), the intermediate appellate court concluded that the to-be-County-owned SWM facility would fall outside the purview of the BCZR by virtue of the fact that it would be a public facility serving an important governmental function. The appellate court placed significant emphasis on the fact that the facility, pursuant to the approved development plan, was to be conveyed in-fee to the County and that it was to be maintained by the County for the purposes of stormwater runoff serving and protecting also neighboring tracts of land, thereby serving broadly the public's health, safety, and welfare. The panel therefore remanded the matter to the Circuit Court with instructions to affirm the CBA's approval of the amended development plan. The intermediate appellate court found it unnecessary to address the other two issues before it.

The People's Counsel of Baltimore County, along with Long Green Valley Community Association, filed with this Court on 8 November 2006 a timely Petition for Writ of Certiorari. We issued the writ, 396 Md. 12, 912 A.2d 648 (2006), in order to consider the following questions: [19]

---

**19.** We reworded the questions for brevity and clarity. The questions framed in the petition for writ of certiorari were as follows:

(1) Whether a storm water management facility required as a condition of private development approval, and serving that develop-

1. Whether the Court of Special Appeals confused subdivision restrictions with zoning use law in a way reminiscent of *Remes v. Montgomery County*, 387 Md. 52, 874 A.2d 470 (2005).

2. Whether a storm water management facility, required as a condition of private development approval, and serving that development, is a "public facility" or "public use" exempt from county zoning law under the reasoning in *Glascock v. Baltimore County*, 321 Md. 118, 581 A.2d 822 (1990), that county governmental uses and land development activities are exempt from local and municipal zoning regulations. In other words, whether the Court of Special Appeals confused conditions for private land development with dedications of land for public use, disregarding distinctions illustrated in *City of Annapolis v. Waterman*, 357 Md. 484, 745 A.2d 1000 (2000).

3. Whether the more-restricted R.C. 2 Agricultural Zone area may be used for a SWM facility and private access road in support of lots developed in the adjoining Rural–Residential Zone Area, where the Agricultural Zone would not permit the lot density those pieces of infrastructure were designed to support.

_____

ment, is a "public facility" or "public use" exempt from county zoning law?

(2) Whether the Court of Special Appeals misapplied, and improperly extended the rule of *Glascock v. Baltimore County*, 321 Md. 118, 581 A.2d 822 (1990), that county governmental uses and activities are exempt from zoning?

(3) Whether the Court of Special Appeals confused conditions for private land development with dedications of land for public use, disregarded distinctions illustrated in *City of Annapolis v. Waterman*, [357 Md. 484, 745 A.2d 1000 (2000),] and confused subdivision restrictions with zoning use law in a way reminiscent of *Remes v. Montgomery County[*, 387 Md. 52, 874 A.2d 470 (2005)]?

(4) Whether the highly restricted Agricultural Zone area may be used for an S.M. facility, private driveway, and lot area for lots developed in the adjoining Rural–Residential Zone Area, where the Agricultural Zone itself would not permit that lot density?

(5) Whether the Court of Special Appeals allowed the equivalent of a disguised rezoning or unauthorized density transfer (a.k.a. *De facto* rezoning of the property)?

4. Whether the Court of Special Appeals allowed the equivalent of a disguised *de facto* rezoning of the R.C. 2 zoned property.

## STANDARD OF REVIEW

██ When this or any appellate court reviews the final decision of an administrative agency such as the CBA, the court looks through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluates the decision of the agency. *Mastandrea v. North,* 361 Md. 107, 133, 760 A.2d 677, 691 (2000) (citing *White v. North,* 121 Md.App. 196, 219, 708 A.2d 1093, 1105 (1998), *rev'd on other grounds,* 356 Md. 31, 736 A.2d 1072 (1999)). We therefore shall focus our attention in the main on the decision of the CBA.

██ In doing so, this Court may not substitute its judgment for the administrative agency's in matters where purely discretionary decisions are involved, particularly when the matter in dispute involves areas within that agency's particular realm of expertise, *see, e.g., Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 68–69, 729 A.2d 376, 381 (1999), so long as the agency's determination is based on "substantial evidence." *See White,* 356 Md. at 44, 736 A.2d at 1079–80; *Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398, 396 A.2d 1080, 1089 (1979). In that latter regard, we inquire whether the zoning body's determination was supported by "such evidence as a reasonable mind might accept as adequate to support a conclusion. . . ." *Annapolis Waterfront Co.,* 284 Md. at 398, 396 A.2d at 1089; *see also Annapolis Waterfront Co.,* 284 Md. at 398–99, 396 A.2d at 1089 ("The heart of the fact-finding process often is the drawing of inferences made from the evidence. . . . The court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.") (citations omitted); *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 447–48, 168 A.2d

390, 392 (1961) (quoting 4 KENNETH CULP DAVIS & RICHARD J. PIERCE, ADMINISTRATIVE LAW § 29.11, at 186 (1958)). Thus, we will uphold the administrative decision of the zoning body, here the CBA, to approve the development plan if that action was "fairly debatable" on the facts as found by it. *White*, 356 Md. at 44, 736 A.2d at 1079–80; *Sembly v. County Bd. of Appeals of Baltimore County*, 269 Md. 177, 182, 304 A.2d 814, 818 (1973); *Bd. of County Comm'rs for Cecil County v. Holbrook*, 314 Md. 210, 216–17, 550 A.2d 664, 668 (1988); *Prince George's County v. Meininger*, 264 Md. 148, 152, 285 A.2d 649, 651 (1972); *Zengerle v. Bd. of County Comm'rs for Frederick County*, 262 Md. 1, 17, 276 A.2d 646, 654 (1971); *Gerachis v. Montgomery County Bd. of Appeals*, 261 Md. 153, 156, 274 A.2d 379, 381 (1971).

■■■■ We are less deferential in our review, however, of the legal conclusions of the administrative body and may reverse those decisions where the legal conclusions reached by that body are based on an erroneous interpretation or application of the zoning statutes, regulations, and ordinances relevant and applicable to the property that is the subject of the dispute. *Belvoir Farms Homeowners Assoc., Inc. v. North*, 355 Md. 259, 267–68, 734 A.2d 227, 232 (1999) (citing *Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 569, 709 A.2d 749, 753 (1998)); *see also Mombee TLC, Inc. v. Mayor and City Council of Baltimore*, 165 Md.App. 42, 884 A.2d 748 (2005) (finding that an appellate court's role "is precisely the same as that of the circuit court," and that "like that court, we are 'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law' ") (citations omitted). When determining the validity of those legal conclusions reached by the zoning body, however, "a degree of deference should often be accorded the position of the administrative agency" whose task it is to interpret the ordinances and regulations the agency itself promulgated. *Marzullo v. Kahl*, 366 Md. 158, 172, 783 A.2d 169, 177 (2001). Thus,

"[e]ven though the decision of the Board of Appeals was based on the law, its expertise should be taken into consideration and its decision should be afforded appropriate deference in our analysis of whether it was 'premised upon an erroneous conclusion of law.'" *Marzullo*, 366 Md. at 172, 783 A.2d at 178 (quoting *Banks*, 354 Md. at 68, 729 A.2d at 380).

## DISCUSSION

### I. Rural Conservation Zones.[20]

Before examining the merits of the parties' arguments, it is appropriate that we first inquire into the permitted uses of R.C. 2 and R.C. 5 zoned land, particularly as it may relate to the placement of access roads and stormwater management facilities in support of residential development. When considering these uses, it is important to keep in mind the overarching principles of the Rural Conservation zones, which are to:

(A) Discourage present land use patterns of development and to create a framework for planned or orderly development;

(B) Provide sufficient and adequate areas for rural-suburban and related development in selected and suitable areas;

(C) Protect both natural and man-made resources from compromising effects of specific forms and densities of development; [and]

(D) Protect areas desirable for more intensive future development by regulating undesirable forms of development

---

**20.** We focus, for the purposes of this opinion, primarily on the purposes and underlying reasons for establishment of the R.C. 2 and R.C. 5 zones. For a more extensive historical discussion of the Resource Conservation Zones in Baltimore County, see *Security Mgmt. Corp. v. Baltimore County*, 104 Md.App. 234, 655 A.2d 1326 (holding that placement of property in Baltimore County's RC–4 resource conservation zone did not constitute a deprivation of the landowner's constitutional rights to either equal protection or substantive due process), *cert. denied*, 339 Md. 643, 664 A.2d 886 (1995).

within these areas until such time as intensive development commences.

BCZR § 1A00.2.

### A. The R.C. 2 Rural–Agricultural Zone

The R.C. 2 agricultural zone's primary purpose is to "foster conditions favorable to continued agricultural use of the productive agricultural areas of Baltimore County by preventing incompatible forms and degrees of urban uses." BCZR § 1A01.1.B.[21] This stated purpose is based on the premise:

a. That Baltimore County is fortunate in that it is endowed with a variety of very productive agricultural soil types which should not be lost unnecessarily to urbanized development;

b. That agricultural industry is an integral part of the Baltimore County economy and that a continued conversion of agricultural land will continue to undermine this basic industry;

c. That scattered development is occurring in a sporadic fashion in areas of Baltimore County containing productive agricultural land;

d. That continued urban intrusion into productive agricultural areas not only destroys the specific area upon which the development occurs but is incompatible with the agricultural use of the surrounding area;

e. That heretofore Baltimore County has been unable to effectively stem the tide of new residential subdivisions in productive agricultural areas of Baltimore County;

\* \* \* \* \* \*

g. That Baltimore County possesses numerous areas which are highly suitable for urban development, including resi-

---

**21.** The R.C. 2 zone was established for the purpose of preserving agricultural land, as opposed to the R.C. 3 mixed-use agricultural classification, which was established in order to "foster conditions favorable to agricultural and residential use of the land while still maintaining the rural character of the area." BCZR § 1A02.1.A.

dential subdivisions which are not located in areas of productive agricultural land.

BCZR § 1A01.1.A.

The primary control device through which the intended purposes of rural-agricultural preservation are carried out are the use regulations contained in BCZR §§ 1A01.2–1A01.4. Although agricultural operations obviously are the preferred use permitted as of right in a R.C. 2 zone, BCZR § 1A01.2.A, other uses are permitted as of right, BCZR § 1A01.2.B, or by special exception. BCZR § 1A01.2.C. Uses permitted as of right, which are pertinent to the present case, include "streets and ways," BCZR § 1 A01.2.B.5, and single-family detached dwellings, BCZR § 1A01.2.B.1.[22] Stormwater management facilities are not mentioned explicitly in the enumeration.

The construction of single-family detached dwellings is subject to height and density regulations found at BCZR § 1A01.3.B. The BCZR provides that no tract within an R.C. 2 zone may be subdivided if it contains a gross area of less than two acres. BCZR § 1 A01.3.B.1. Tracts having a gross area of between two and 100 acres may not be subdivided into more than two lots total. *Id.* For tracts above 100 acres in size, they may be subdivided at a density of no more than one lot per 50 acres. *Id.* In terms of minimum lot size, no lots having a gross area of less than one acre may be created in a R.C. 2 zone. BCZR § 1A01.3.B.2. "No more than one principal dwelling is permitted on any lot in an R.C. 2 Zone." BCZR § 1A01.3.B.4.

----

**22.** "Uncontrolled excavations," which are

[t]he digging of soil, sand, gravel, rock, minerals, clay or other earthen material from a land surface for any of the following purposes: When incidental to the operation of a permitted business or manufacturing use located on the same property, but excluding any digging of material for sale, exchange, processing or manufacture; *For grading or other purposes incidental to improvement of the land; and When incidental to the development of land or to grading for public improvements[,]*

BCZR § 101 (emphasis added), likewise are permitted as of right when ancillary to otherwise permitted uses in the zone. BCZR § 1A01.2.B.9.a.

## B. The R.C. 5 Rural–Residential Zone

The R.C. 5 rural-residential zone was established by Baltimore County on the premise that, among other things, rural-residential development "constitutes a wasteful use of land and is fiscally expensive to serve with respect to the provision of basic services." BCZR § 1A04.1.A.1.b.[23] In that vein, the R.C. 5 zone was created in order to:

1. Provide for rural-residential development in suitable areas in which basic services are not anticipated.

2. Eliminate scattered and generally disorderly patterns of future rural-residential development.

3. Assure that encroachments onto productive or critical natural resource areas will be minimized.

4. Provide a minimum lot size which is sufficient to provide adequate area for the proper functioning of on-lot sewer and water systems.

BCZR § 1A04.1.B.1–.4. Permitted uses of right in the R.C. 5 zone pertinent to the present case are single-family detached dwellings, BCZR § 1 A04.2.A.2, and streets and ways, BCZR § 1A04.2.A.7. Stormwater management facilities are not mentioned as such in the list of permitted uses within the R.C. 5 zone.[24]

A primary difference between the R.C. 2 and R.C. 5 zones, presumably because of the divergent foci between them in terms of residential and agricultural development, are the density levels permitted in each. Minimum lot size and density levels permitted within the R.C. 5 zone are more generous than those allowed in the R.C. 2 zone. The regulations provide that no lot may be created within the R.C. 5 zone with a total gross area of less than 1.5 acres, BCZR § 1A04.2.B.a, and the maximum allowable residential density within the zone is 0.5 dwellings per acre. *Id.*

---

**23.** For a complete list of the findings underlying the creation of R.C. 5 zones, see generally BCZR § 1A04.1.A.

**24.** Like the R.C. 2 zone, uncontrolled excavations accessory to permitted uses are allowed.

## II. What is to be Made of the Fact That a SWM Facility, Which is a Utilization of the Property Required by the County as a Pre–Condition to the Approval of a Proposed Development, is Not Addressed As Such As a Permitted Use in the Zoning Regulations?[25, 26]

Respondents posit that construction and operation of a SWM facility "is not a use within the contemplation of the zoning regulations" because the management of stormwater is

25. This question applies only to the stormwater management facility in the development plan. Access roads clearly are "uses" permitted as of right in both the R.C. 2, BCZR § 1A01.2.B.5, and R.C. 5 zones, BCZR § 1A04.2.A.7.

26. An appellate court generally may not affirm an administrative agency (here the CBA) on grounds on which the agency itself did not rely in making its decision. *Anderson v. Dep't of Pub. Safety & Correctional Servs.*, 330 Md. 187, 213 n. 2, 623 A.2d 198, 211 n. 2 (1993) ("[I]n judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency.") (quoting *United Steelworkers of America Local 2610 v. Bethlehem Steel*, 298 Md. 665, 679, 472 A.2d 62, 69 (1984)); *see Motor Vehicle Admin. v. Shepard*, 399 Md. 241, 260, 923 A.2d 100, 111 (2007) ("[T]he reviewing court, restricted to the record made before the administrative agency, may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency. Stated differently, an appellate court will review an adjudicatory agency decision solely on the grounds relied upon by the agency.") (citing *County Council of Prince George's County v. Brandywine Enterprises, Inc.*, 350 Md. 339, 349, 711 A.2d 1346, 1350–51 (1998); *Cicala v. Disability Review Bd. for Prince George's County*, 288 Md. 254, 260, 418 A.2d 205, 209 (1980)); *Ins. Comm'r v. Equitable Life Assurance Soc'y of the United States*, 339 Md. 596, 634, 664 A.2d 862, 881 (1995) ("[J]udicial review of administrative decisions is limited to the issues or grounds dealt with by the administrative agency.") (citations omitted).

The CBA, when addressing "whether an R.C. 2 zoned property can be used to support the development of R.C. 5 property, including density, stormwater management (SWM), and a road or driveway," found "compelling testimony that the [SWM] facility in this case will not solely support the development in R.C. 5 but will also be used to support the development in the R.C. 2 zone." More importantly, as an alternate basis to conclude that there was no zoning impediment to the development plan, "[t]he Board also cited compelling testimony that stormwater management facilities are like landscaping and not identified as a principal use in any zone."

not addressed as such in the enumeration of permitted uses in the BCZR in the R.C. 5 or R.C. 2 zones. Rather than constituting a "use" in and of itself, Md.Code (1982, 2007 Repl.Vol.), Environment Article, § 4-204; Baltimore County Code § 33-4-104(b), Respondents contend that, because development regulations and zoning laws are separate, but interrelated bodies of law, the SWM facility, at least under the circumstances of the present case, falls outside regulation by the BCZR, notwithstanding Petitioners' assertion to the contrary.

■ It must be conceded, as general rule, that, when a zoning ordinance enumerates specifically the permitted uses within a particular zone, the ordinance "establish[es] that the only uses permitted in the [ ] zone are those designated as uses permitted as of right and uses permitted by special exception. Any use other than those permitted and being carried on as of right or by special exception is prohibited." *Kowalski v. Lamar*, 25 Md.App. 493, 499, 334 A.2d 536, 540 (1975) (citations omitted); *see also* ARDEN H. RATHKOPF & DAREN A. RATHKOPF, 1 THE LAW OF ZONING & PLANNING § 1:7 (4th ed. 2005) ("Reported court decisions often involve simply whether an owner's proposed use within a particular zoning district is a use allowed by right, an accessory use, a specially permitted use, or a use entirely prohibited within that district.").

■ It is well-settled that zoning regulations and subdivision controls regulate different aspects of the land use regulatory continuum. *Coffey v. Maryland–Nat'l Capital Park & Planning Comm'n*, 293 Md. 24, 30, 441 A.2d 1041, 1044 (1982) (holding that zoning and subdivision planning "represent separate municipal functions and neither is a mere rubber-stamp for the other") (quoting *Popular Refreshments, Inc. v. Fuller's Milk Bar*, 85 N.J.Super. 528, 205 A.2d 445 (App.Div.1964), *cert. denied,* 44 N.J. 409, 209 A.2d 143 (1965)); *Remes v. Montgomery County*, 387 Md. 52, 64 n. 8, 874 A.2d 470, 477 n. 8 (2005); *Wesley Chapel Bluemount Ass'n v. Baltimore County*, 347 Md. 125, 129, 699 A.2d 434, 436 (1997)

(citing generally *Board of County Comm'rs v. Gaster*, 285 Md. 233, 401 A.2d 666 (1979)). *See also* ARDEN H. RATHKOPF & DAREN A. RATHKOPF, 5 THE LAW OF ZONING & PLANNING § 90:24 (4th ed. 2005) ("[W]here the rules and regulations enacted or approved by the legislative body as a guideline for the planning board contain requirements different from those imposed by the zoning ordinance with respect to lot size, frontage, width, setback or other non-use features, or standards relating to design of the subdivision such as road length, size of cul-de-sacs, location of points of ingress and egress and the like, such rules and regulations have been held to control. For example, where the subdivision regulations provide that a subdivision must be compatible with the county master plan and the proposed plat shows a greater density than called for in the master plan, the subdivision may be rejected although the zoning ordinance permits the density proposed."). While zoning laws define the uses that are permitted in a particular zoning district, *i.e.*, the R.C. 5 and R.C. 2 zones, subdivision regulations inform how, when, and under what circumstances a particular tract may be developed. *Remes*, 387 Md. at 74, 874 A.2d at 482 ("[Z]oning dictates what one can build on, or how one may use his property while subdivision or planning determines how the land is divided"). Included in these subdivision controls are provisions which require the developer/property owner to construct infrastructure improvements of various types necessary to support "uses" permitted in the zone by the applicable zoning regulations.

 Despite their different aims, however, the two regulatory schemes are intended to complement each other in terms of the safety, health, and general welfare of the community at large. Zoning regulations and subdivision/development controls, along with the establishment of a master plan in a particular locality, serve additional common objectives in terms of the effective, efficient, and consistent use of land within similarly-situated districts. *Coffey*, 293 Md. at 30, 441 A.2d at 1044. As we stated in *Wesley Chapel Bluemount Association*,

[g]overnmental control over land development is effected principally in three ways—through the adoption of (1) master plans delineating the desired uses for all land within the planning area, both for development and for roads, parks, schools, and other public purposes, (2) zoning regulations designed to implement the master plans by placing legal restrictions on the use of the land by non-governmental persons and entities, and (3) subdivision and other development regulations designed to ensure that private development of the land is consistent with the applicable master plan and zoning regulations. Although each of these devices has an independent purpose and may be subjected to a separate development and approval procedure, their functions, to some extent, coalesce, in that they are all designed to assure that land development occurs in a manner that is consistent with overall legislative policy and community welfare.

347 Md. at 129, 699 A.2d at 436 (citing generally *Bd. of County Comm'rs v. Gaster*, 285 Md. 233, 401 A.2d 666 (1979)). Thus, although zoning laws and subdivision regulations are separate forms of regulation, and typically are administered by different governmental agencies or bodies, they operate in practical application to ensure that land in a particular locality is developed in a relatively uniform and consistent manner, especially when Euclidian zones,[27] such as the R.C. zones, are concerned.

---

27. "Euclidean zoning is a fairly static and rigid form of zoning named after the basic zoning ordinance upheld in *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926)." *Mayor & Council of Rockville v. Rylyns*, 372 Md. 514, 534, 814 A.2d 469, 480 (2002). As we stated in *Rylyns:*

"The term 'Euclidean' zoning describes the early zoning concept of separating incompatible land uses through the establishment of fixed legislative rules. . . . " 1 ZIEGLER, RATHKOPF'S THE LAW OF ZONING AND PLANNING (4th Ed. Rev. 1994), § 1.01(c), at 120 ("Rathkopf's"). Generally, by means of Euclidean zoning, a municipality divides an area geographically into particular use districts, specifying certain uses for each district. "Each district or zone is dedicated to a particular purpose, either residential, commercial, or industrial," and the "zones appear on the municipality's official zoning map." 5

Nowhere in any of the relevant cases explaining the differences between zoning and subdivision regulation is there an indication that improvements required by a subdivision regulation may be placed anywhere the developer wishes, regardless of an improvement's location relative to internal zoning boundaries and their requirements.[28] To the contrary, all proposed

---

Rathkopf's, § 63.01, at 63–1–2. In this way, the municipality "provides the basic framework for implementation of land use controls at the local level." 1 Rathkopf's, § 1.01(c), at 122.

372 Md. at 534, 814 A.2d at 480 (quoting *Rouse–Fairwood Dev. Ltd. P'ship v. Supervisor of Assessments for Prince George's County,* 138 Md.App. 589, 623, 773 A.2d 535, 555 (2001)). "Euclidian zoning is designed to achieve stability in land use planning and zoning and to be a comparatively inflexible, self-executing mechanism which, once in place, allows for little modification beyond self-contained procedures for predetermined exceptions or variances." *Rylyns,* 372 Md. at 534, 814 A.2d at 481.

28. In *Remes v. Montgomery County,* 387 Md. 52, 874 A.2d 470 (2005), for example, we were called upon to determine whether two contiguous subdivided lots merged for zoning purposes as it related to Montgomery County's issuance of a permit for the construction of a single-family dwelling on one of the "combined" lots which, if the lots were individually owned, would have violated a number of the County's spatial zoning requirements relative to setbacks, vehicular access, and accessory uses. 387 Md. at 59, 68, 874 A.2d at 473–74, 479. The two contiguous lots were under common ownership at the time Montgomery County's Division of Permitting Services ("DPS") issued an earlier permit for the construction of the existing single-family dwelling on one of the lots. *Remes,* 387 Md. at 58, 874 A.2d at 473. The lots were assessed by the County as one lot for tax purposes. *Id.* The newer permit was issued to the respondent, a developer, who was not, at the time of issuance, the owner of record of the lot where the second dwelling was proposed. *Remes,* 387 Md. at 59, 874 A.2d at 473.

When the common owner, one month after issuance of the new permit, attempted to convey to the respondent the lot, the petitioner, a neighboring land owner, filed in the Circuit Court for Montgomery County a Complaint for Declaratory and Injunctive Relief, seeking to rescind the sale and enjoin any future sale of the lot. *Remes,* 387 Md. at 59, 60, 874 A.2d at 474. The petitioner's challenge was based on his belief that the two lots had merged for zoning purposes, *Remes,* 387 Md. at 60, 874 A.2d at 474, an issue that this Court raised, but did not decide in *Friends of the Ridge v. Baltimore Gas & Electric Company,* 352 Md. 645, 658 n. 11, 724 A.2d 34, 41 n. 11 (1999):

An owner of contiguous parcels who erects a structure in what would ordinarily be a setback of one of the individual parcels might, under this doctrine, although we do not now decide it, also cause a combination of lots thus restricting the future alienability of the unbuilt

subdivision developments must comply with the applicable zoning ordinances in effect at the time the subdivision is proposed. Baltimore County Code § 32–4–104 ("Proposed development shall be in compliance with the present zoning classification on the property to be developed."); Baltimore County Code § 32–4–114(a) ("Except as otherwise provided in this title, all development shall comply with this title and all other applicable laws or regulations of the county."); *Wesley*

---

upon parcel because the conveyance of that parcel would cause the property upon which the structure is built to be in violation of the ordinance. Such an owner would also risk being forced to bring that parcel into conformity by removing the structure from the setback. We ultimately concluded that, because the two lots "were under common ownership, and at the time of that common ownership, they were used in service to one another," they merged for zoning purposes. *Remes*, 387 Md. at 87, 874 A.2d at 490. Our decision was based, at least in part, on the concept that

zoning merger is not a resubdivision. When zoning merger occurs, the lots remain divided. Thus, zoning merger, in effect, is an adjustment of zoning requirements. It has no effect on subdivision. Title examiners regularly consider aspects of zoning when examining titles in order to be able to indicate to purchasers the uses that can be made of a property. Those uses have no effect on subdivision regulation. One must comply with *both* zoning and subdivision requirements. In the present case, the applicant cannot meet zoning requirements because of the doctrine of zoning merger and thus, while Lot 11 may be sold, it cannot be used, absent zoning variances or other zoning relief, if any.

*Remes*, 387 Md. at 67, 874 A.2d at 478. Thus, we concluded that the lot could not be sold to another party, notwithstanding the previous subdivision, if construction on that lot would otherwise violate the zoning setbacks applicable to the lots if the common ownership were severed.

A broad reading of our decision in *Remes* might support the conclusion that zoning laws and subdivision regulations are rigidly separate and distinct. No language in that case, however, supports the conclusion that an improvement not explicitly addressed in the zoning laws, but otherwise required by the subdivision regulations, is exempt from the zoning requirements.

*Wesley Chapel Bluemount Association v. Baltimore County*, the principal case relied on by Respondents, was a case of statutory interpretation involving whether the review process of a subdivision development plan proposed in a resource conservation zone constituted a "zoning matter" requiring, pursuant to Maryland Code (1957, 1995 Repl.Vol.), State Government Article, § 10–503, open deliberations by the Baltimore County Board of Appeals. 347 Md. 125, 136, 699 A.2d 434, 439–40 (1997). Beyond the abstractly stated principle that zoning law and

*Chapel Bluemount Ass'n,* 347 Md. at 129, 699 A.2d at 436 ("[Z]oning decisions take into account the provisions of the applicable master plan and subdivision and development approvals take into account compliance with applicable zoning regulations.").

 Respondents' interpretation, however, that a SWM facility is not contemplated by, and therefore not subject to the BCZR generally and the R.C. 2 and R.C. 5 regulations specifically, when required in conjunction with single-family residential permitted use, defies logic and common sense because, at the same time, it is required by the subdivision controls as a condition of approval of that subdivision. The fault in Petitioners' reasoning is particularly apparent when the BCZR, read in broader context, contemplates expressly the construction of SWM facilities despite the absence as an enumerated permitted "use" as such in any of Baltimore County's resource conservation zones. In the R.C. 6 (Rural Conservation and Residential) zone, for example, no specific reference is made to stormwater management in terms of "uses" permitted, as of right or otherwise. BCZR § 1A07.3. Yet, the BCZR provisions governing use of land in the R.C. 6 classification provide that "[s]tormwater management facilities must be integrated with the *topography of the site* and consistent with the visual appearance of the surrounding natural features." BCZR § 1A07.8.C.1. The BCZR follow an identical pattern in its provisions relating to the R.C. 7 (Resource Preservation) zone. While stormwater management facilities are not mentioned as "uses" permitted in the R.C. 7 zone, BCZR § 1A08.3, another provision otherwise makes specific reference to stormwater management. SWM facilities located in R.C. 7 zones "must be integrated with the topography of the site and consistent with the visual appearance of the surrounding natural features." BCZR § 1A08.6.C.1. In like fashion, the provisions pertaining to R.C. 8 (Environmental Enhancement) zones do not mention SWM facilities as "uses"

---

subdivision regulations are independent, but related, concepts, *Wesley Chapel Bluemount* does not support Respondents' argument as framed.

permitted in the zone, yet they provide that SWM facilities "shall be integrated into the site design to utilize nonstructural practices unless it is demonstrated that this is not possible." BCZR 1 A09.7.C.1. Thus, regardless of whether an SWM facility properly may be characterized as a "use" in its traditional sense, it is clear that SWM facilities are nevertheless clearly contemplated by, and embraced by, the BCZR's basic zoning scheme in conjunction with allowed, explicitly mentioned uses in the rural conservation zone scheme generally. Thus, SWM facilities, required by subdivision regulations in conjunction with permitted uses in the R.C. 2 and R.C. 5 zones, are not exempt from regulation under the BCZR merely because SWM facilities are not mentioned in the permitted use enumerations.

Moreover, though we do not decide here whether a stormwater management facility is an "uncontrolled excavation" within the meaning of that term as permitted in the R.C. 5 and R.C. 2 zones as an ancillary use, primarily because Respondents did not file a cross-petition for certiorari raising that issue which they pursued in the Circuit Court, we observe that the construction of stormwater management ponds typically requires "the digging of . . . earthen material from a land surface . . . [f]or grading or other purposes incidental to improvement of the land; and [w]hen incidental to the development of land or to grading for a public improvement[ ] . . .," BCZR § 101, such as here to serve to control run-off from a proposed residential subdivision. Thus, it seems not inconsistent with the development of expressly permitted uses, like single-family detached homes allowed in the R.C. 5 and R.C. 2 zones, to allow ancillary required infrastructure such as SWM facilities.

By the same token, there is no Maryland authority for Respondents' proposition that infrastructure improvements in the development approval process are immune from appropriate zoning requirements, where the zoning ordinance may be wholly silent on the subject, because the improvements are required as conditions of the subdivision regulations. The more reasonable construction is that when an infrastructure

improvement ancillary to an otherwise permitted residential subdivision is required as a condition to county approval of the development plan, some flexibility is implied in the definition of the "uses" which are subject to the zoning regulations of the county, particularly when certain other provisions of the same zoning regulations, despite the absence from the enumeration of the permitted "uses" in the particular zone of the particular "use," contemplate specifically that utilization of the land. SWM management facilities are contemplated by the zoning scheme despite the lack of their express inclusion as "uses" in the permitted use enumerations in the BCZR.

III. **Under the Circumstances of the Present Case, the Decisions of the Commissioner and CBA That There are No Zoning Impediments to Placing the SWM Facility and a Portion of the Interior Access Road in the R.C. 2 Zone are Correct.**

"Whenever a single tract is divided by a zone boundary so that portions of such a tract lie within R.C. Zones of different classifications, the total number of dwellings or density units permitted shall apply to each tract individually and, for the purpose of these regulations, shall be considered as separate parcels." BCZR § 1A00.5. With this in mind, Petitioners argue that, because "each zone is designed and structured with uniformity and to be self-contained with respect to principal and accessory uses," it is impermissible to locate in the R.C. 2 agricultural zone infrastructure, *i.e.*, the SWM facility and access road, designed to support lots located on the R.C. 5 rural residential land, especially where the zoning laws applicable to the agricultural zone would not permit the lot density the road and SWM facility were designed to support. Respondents, on the other hand, argue that no such zoning conflict exists between the commonly-owned, split-zoned Property.

A. **The Proposed Placement of the SWM Facility on the R.C. 2 Land Would Not Violate the BCZR.**

The record indicates that there was substantial disagreement between the parties at the CBA hearing regarding

the consequences of placement of the SWM facility. Daniel O'Leary, a principal civil engineer called by Petitioners as an expert in stormwater management, testified as to various aspects of the placement of the SWM facility. Mr. O'Leary explained, *inter alia,* that, from a design standpoint, there would be more uncontrolled or un-managed flow from the development if the drainage pond were moved upgradient.[29] As such, he testified that, if the SWM facility were placed entirely within the R.C. 5 zone, "there may be some areas along the R.C. 5/R.C. 2 border that may no longer drain to it because they [would not] physically drain there," although he acknowledged that moving the facility onto the R.C. 5 land would not be fatal to the general development scheme. Regarding the environmental impacts of increased runoff from both the development and the access road ancillary to the proposed construction, counsel for Respondents inquired whether "there would be more uncontrolled runoff if [the SWM facility] were constructed in the R.C. 5 versus R.C. 2 location." Mr. O'Leary replied, "Yes."

When asked whether the SWM facility would be smaller in size if designed to serve either the R.C. 2 lot by itself or, more abstractly, a single-lot development, O'Leary testified as follows:

Question: If ... you had none of this development in the R.C. 5, and you simply had one house where it's currently proposed on lot number seven, would you need a stormwater management facility?

Answer: I don't think so. You would still need to address stormwater management.

Q: But you would not need a facility such as the size and magnitude that's proposed on this [Respondent]'s [development plan]?

---

**29.** Reports and plats depicting the topography of the land apparently indicate that the area in the vicinity of the R.C. 5 / R.C. 2 zoning boundary is a low point such that the bulk of stormwater runoff originating from the proposed development would flow into the SWM facility as sited by Respondents.

A: I said [it would] be very unusual to have a stormwater management device for a single lot. So, yes. You have to address it, so not knowing exactly what the impact is from just that lot would be, it [is] hard for me to say. But it [is] unlikely a pond, for instance, would be required for a single lot development.

\* \* \*

Q: In follow up then, it [is] the density of the housing on the R.C. 5 along with the road system that requires the facility that [is] proposed on the [Respondent]'s [development plan].

A: Yes.

In a follow up question, Respondents' counsel asked O'Leary whether the SWM facility, as proposed on the R.C. 2 zoned land, would be effective controlling the runoff from the R.C. 5 property. O'Leary replied in the affirmative, indicating that at least three of the R.C. 5 lots and the roadway, which, in his opinion, was the most important factor because it would create the most runoff draining into the stormwater management pond, flowed to the facility.[30] Moreover, O'Leary testified that, because the Property sits on a low ridge, the R.C. 2 lot on the east portion of the Property actually would drain to the east and not into the SWM facility. While the bulk of the runoff collecting in the SWM facility would originate from the R.C. 5 lots, however, runoff originating from the stretch of the interior access road in the R.C. 2 zone would flow into the SWM pond.[31]

---

30. Specifically, O'Leary testified that a small amount of run-off originating from the interior access road, which began on the R.C. 5 land and traversed the R.C. 2 portion, would drain into the SWM facility.

31. Although the Baltimore County Code provides that SWM facilities must be able to accommodate runoff from "[t]he entire upstream area, if the area were fully developed in accordance with the Baltimore County Zoning Regulations in effect at the time of the design or construction," Baltimore County Code § 33–4–410(c)(ii), there is no evidence on the record before us that there are streams or areas upgrade from the Property that will produce additional or accelerated runoff.

In reaching its decision to affirm the Commissioner's approval of the development plan, the CBA placed significant emphasis on the testimony of O'Leary regarding the efficacy of placing the stormwater management at the low point on the Property in an effort to minimize runoff, "indicating th[at], if the stormwater management facility were moved from the R.C. 2 zone to the R.C. 5 zone, runoff would actually be increased." We conclude that a reading of the SWM development regulations, as well as the BCZR, supports the CBA's decision.

The County's entire purpose in requiring adequate stormwater management is "to protect, maintain, and enhance the public health, safety, and general welfare by establishing minimum requirements and procedures to control the adverse impacts associated with increased stormwater runoff." Baltimore County Code § 33–4–102; BALTIMORE COUNTY DEP'T OF ENVTL. PROT. & RES. MGMT., STORM WATER MANAGEMENT ENGINEERING REGULATIONS, Article 5 § 14–151(A) (2001). This coincides, to some degree, with one of the stated purposes of the BCZR resource conservation zones to "[p]rotect both natural and man-made resources from the compromising effects of specific forms and densities of development." BCZR § 1A00.2.B.

Stephen Preston, a resident in the community located to the west of the Property, testified, before the CBA, as to his concerns regarding stormwater runoff. Mr. Preston testified that "[t]he Lynch Property itself is a low ridge, basically, so that it runs off on every side onto adjacent property. It runs off to the east into Gunpowder State Park, and it runs off to the west through the adjoining properties [ ]." Mr. Preston referred specifically to a map of the area surrounding Gunpowder State Park, and testified that the map "show[ed] the fact that [the Property sat on] a low ridge with drainage off of the east, north, and west occurring on [his (Mr. Preston's)] property immediately below where that runoff occurs." Mr. Preston testified further that his property, and the property of Mr. Elser, his neighbor to the south, sat lower than the Lynch Property, such that stormwater drained off the Property and

onto their land. As the Commissioner concluded correctly, the entire purpose of having a SWM facility is to maintain stormwater runoff onto neighboring parcels at the level pre-dating construction, and as if the Property were undeveloped. BALTIMORE COUNTY DEP'T OF ENVTL. PROT. & RES. MGMT., STORM WATER MANAGEMENT ENGINEERING REGULATIONS, Article 5, § 14–151(C) (2001) ("Proper management of stormwater management runoff will: (1) Minimize damage to public and private property; (2) Reduce the effects of development on land and stream channel erosion; (3) Assist in the attainment and maintenance of water quality standards; (4) Reduce local flooding; and *(5) Maintain after development, as nearly as possible, the predevelopment runoff characteristics.*") (emphasis added).

The record reflects that the SWM facility design was based on the topography, the location of impervious surfaces on the Property, and achieving a pre-development rate of stormwater runoff. The CBA determined that "if the SWM facility were located in the R.C. 5 zone, that change would result in more uncontrolled or unmanaged runoff." Although "most of the runoff directed to [the SWM facility] will originate in the R.C. 5 zone," the runoff originating from the R.C. 2 portion of the road will flow additionally into the SWM facility. In other words, the SWM facility is ancillary to the single-family dwellings in both the R.C. 5 and R.C. 2 lots, which are uses permitted as of right in both zones. Based on the evidence in this record, if the Commissioner and CBA, charged with interpreting the resource conservation provisions of BCZR, chose to place emphasis on the environment impacts associated with placement of the SWM facility, a conclusion based on those environmental impacts to approve the development plan was not unreasonable or irrational.[32]

---

**32.** We note that it appears that the location of the SWM facility on the R.C. 2 land, as proposed, is neutral in terms of the total density and yield of the proposed development. Before the CBA, it was undisputed that the R.C. 5 land could support a theoretical maximum of seven dwellings. The development plan proposed only six dwellings in the R.C. 5 zone. Naturally, the developer is not entitled automatically to

The CBA's conclusion also is reasonable considering that BCZR provisions relating to the overall resource conservation scheme contemplate SWM facilities and that they should be sited according to topographical considerations. As stated *supra*, the BCZR provisions governing use of land in the R.C. 6 classification provide that "[s]tormwater management facilities must be integrated with the *topography of the site* and consistent with the visual appearance of the surrounding natural features." BCZR § 1A07.8.C.1 (emphasis added); BCZR § 1A08.6.C.1.(providing that SWM facilities located in R.C. 7 (Resource Preservation) zone "must be integrated with the topography of the site and consistent with the visual appearance of the surrounding natural features."); *see also* BCZR 1A09.7.C.1 (stating that, in the R.C. 8 (Environmental Enhancement) zone, SWM facilities "shall be integrated into the *site design* to utilize nonstructural practices unless it is demonstrated that this is not possible.").[33] The Baltimore County Code provisions governing SWM management provide that a "site" may be comprised of one lot or even multiple lots if those lots are commonly owned and where those lots, when completed, will form a larger subdivision. Baltimore County Code § 33–4–101(dd) (defining a "site" as "any tract, lot, or parcel of land, *or combination of tracts, lots, or parcels of land, that are in one ownership,* or are contiguous and in diverse ownership, *where development is to be done as part of a unit, subdivision, or project* . . . .") (emphasis added).

the maximum number of lots that a property would yield mathematically; however, nothing on this record indicates that the developer's placement, in the R.C. 2 zone, of the SWM facility maximized the achievable density in the R.C. 5 zone.

**33.** We do not construe the absence of similar provisions in the BCZR for the R.C. 2 or R.C. 5 zones as indicative of a legislative intent that stormwater management facilities are prohibited in those zones. Rather, a comprehensive overview of the resource conservation zoning scheme, subdivision requirements, and the stormwater management regulations compel the conclusion that such infrastructure improvements, where required by proposing the development of otherwise permitted primary uses in those zones, are allowed.

**B. Placement of the Access Road Did Not Violate the Resource Conservation Provisions of the BCZR Where There is Evidence in the Record that the Road was Designed to Provide Access to Both the R.C. 2 and R.C. 5 lots.**

 Turning our focus to the access road, although we agree with Petitioners that "zoning ordinance[s][are] concerned with the use of property and not with ownership thereof nor with the purposes of the owners or occupants," *Anderson v. Associated Professors of Loyola College,* 39 Md. App. 345, 349, 385 A.2d 1203, 1204–05 (1978); *Mayor & City Council of Baltimore v. Poe,* 224 Md. 428, 433, 168 A.2d 193, 195 (1961); *Boulevard Scrap Co. v. Mayor and City Council of Baltimore,* 213 Md. 6, 10, 130 A.2d 743, 745 (1957), we conclude that the R.C. 2 and R.C. 5 zoning regulations do not conflict where the road is designed to service identical permitted uses in both zones.

In the present situation, the proposed development, currently in common ownership, is split-zoned, but each zone allows single-family, detached residential dwellings as primary uses permitted as of right. Streets and ways are permitted as of right in both zones in order to provide access to major roads for the purposes of ingress and egress. The foundation of the controversy manufactured for this case is that other zoning regulations applicable to each zone differ in terms of permissible lot density.

In *Leimbach Construction Co. v. Mayor and City Council of Baltimore,* 257 Md. 635, 264 A.2d 109 (1970), there were two adjacent parcels of land, under common ownership, one zoned for residential use and the other for commercial use. *Leimbach Construction Co.,* 257 Md. at 637, 264 A.2d at 109. Because the pre-existing access to the commercial lot was made impossible by the earlier collapse of a bridge leading to the property, the landowner applied for a permit to install a driveway across the otherwise vacant residential lot. *Leimbach Construction Co.,* 257 Md. at 637, 264 A.2d at 109–10. Because there were no structures on the residential lot to be served by the proposed road, it was manifest that the access

road located within the residentially-zoned lot was intended to serve only the commercially-zoned lot. *Leimbach Construction Co.*, 257 Md. at 637–38, 264 A.2d at 110. In concluding that the road impermissibly "would be a 'business' use of land in a residential use district," *Leimbach Construction Co.*, 257 Md. at 640, 264 A.2d at 111, our predecessors reasoned, somewhat naively, that "[a]ccess can be accomplished on foot or on horseback; material can be fetched by pack-train. A bridge would be far more convenient, of course, and, in the long run, much less expensive. But this is none of our concern. . . ." *Id.*

As the CBA correctly pointed out in this case, "[i] f the roadway had been constructed only across the R.C. 2 land and its sole use was to access the lots in the R.C. 5 zone, then Petitioner's argument may have some merit." In *Leimbach,* the road had no apparent or immediate utility in terms of proposed uses on the residential lot on which it was located. In the present case, however, the proposed access road encroaches upon only a small portion of the R.C. 2 lot, and is ancillary to the proposed single-family, detached dwellings on both the R.C. 2 and R.C. 5 zoned lots. The access road is a use permitted as of right in both the R.C. 2 and R.C. 5 zones according to BCZR §§ 1A01.2.B.5 and 1A04.2.A.7, respectively, and serves as a mode of ingress and egress for the homes located in both zones. While certainly *Leimbach* may be said to support the proposition that "each zone is designed and structured with uniformity and to be self-contained with respect to principal and accessory uses," we find nothing in the BCZR, the subdivision regulations, or our precedents which indicates that, when a split-zoned property, in which both portions are under common ownership when developed, is to contain infrastructure improvements ancillary to permitted uses consistently allowed in both zones, the relative infrastructure must be located entirely within the more densely-developed zone.[34]

---

34. In this regard, the CBA appears to have parsed the problem in different ways under different circumstances, but not so inconsistently

We are not persuaded by Petitioner's direction of our attention to *Delbrook Homes, Inc. v. Mayers,* 248 Md. 80, 234 A.2d 880 (1967), *Board of County Commissioners of Anne Arundel County v. Snyder,* 186 Md. 342, 46 A.2d 689 (1946), or *Alviani v. Dixon,* 365 Md. 95, 99, 775 A.2d 1234, 1236 (2001), as support for the sweeping proposition that accessory uses may not be located in zones in which the principal use they serve is prohibited.

In *Delbrook Homes,* Chartwell, a private community located in Anne Arundel County, sought to operate a beach area for its residents in a nearby water-oriented community known as Lakeland. 248 Md. at 82, 234 A.2d at 882. Neighbors residing in Lakeland challenged the use of the beach area by Chartwell residents and their guests, claiming that it created traffic problems, excess noise, and other various encroachments, including individuals parking and otherwise trespassing on their property. *Delbrook Homes,* 248 Md. at 83–84, 234 A.2d at 882–83. Our task was to determine "whether such a

---

with regard to its determination here. The record reflects that, in *In re Beth Tfiloh Congregation of Baltimore City, Inc.,* 01–468–SPH, CBA–01–136 (24 July 2002), Beth Tfiloh Congregation, owned an existing synagogue in a D.R. 1 (Density Residential) zone. When the Congregation sought to construct in the D.R. 1 zone a private school, dining hall, and gymnasium, the property owner sought also to construct in the adjacent R.C. 4 (Watershed Protection) zone camp bunkhouses and athletic fields in order to serve as accessory uses to the private school and synagogue located in the D.R. 1 zone.

The Congregation attempted to justify the location of the recreational facilities by arguing that they were accessory to the school, a use which was permitted explicitly in the D.R. 1 zone. Although the CBA acknowledged that "the bunkhouses and athletic fields and facilities [did] qualify as 'accessory uses' to the principal uses in the D.R. 1 property," because the R.C. 4 zone, the location in which the accessory uses were to be placed, did not permit the principal school use, the CBA nevertheless determined that the accessory uses were prohibited in the R.C. 4 zone.

In contrast, the proposed access road in the present case is ancillary to a single-family dwelling, a principal use permitted as of right in the R.C. 2 rural-agricultural district. Thus, we find that *Beth Tfiloh* is distinguishable, and conclude accordingly that the CBA did not commit legal error by refusing to consider it in the present case.

private community beach must be located within the perimeter of, or contiguous to the community which it serves."

*Delbrook Homes,* 248 Md. at 82, 234 A.2d at 881. We concluded that land owned in a separate water-oriented community could not be used as a "private community beach," under the Anne Arundel County zoning ordinances, where the beach is located outside the boundaries of the community it was intended to serve. Our decision hinged on the fact that

[t]he term "private community beach" in the context of the zoning ordinance means a beach for the use and benefit of the surrounding and neighboring property owners, *not one for the exclusive use of a community in another area.* Although the uses imposed on the property by either group might well be identical, the fact remains that the residents of Chartwell cannot be expected to assume attitudes of responsibility toward the surrounding neighborhood and community control over the beach facilities as would those who reside in close proximity to the beach, that is, the residents of the Lakeland area.

*Delbrook Homes,* 248 Md. at 83, 234 A.2d at 882 (emphasis added). In other words, the violative land use was for the exclusive use of the Chartwell residents, to the exclusion of Lakeland residents. As indicated *supra,* we deal in the present case with a situation where the proposed use is ancillary to and serves permitted uses on both parcels of land.

*Snyder* is similarly distinguishable. Maurice Snyder applied for a permit to construct on Solomon's Island Road in Edgewater, Maryland, a showroom, office, lounge, and warehouse for the sale and display of factory-built motor boats. *Snyder,* 186 Md. at 343, 46 A.2d at 690. The proposed development site was located in a residential zoning district. *Snyder,* 186 Md. at 344–45, 46 A.2d at 690–91. Although we concluded there that "[t]he whole purpose of the [zoning] regulations is to exclude mercantile, manufacturing and trade activities from the area, and to permit therein only residential and farming activities," *Snyder,* 186 Md. at 345, 46 A.2d at 691, the case involved in no way a situation where the owner

was building infrastructure in order to support two differently zoned parcels of commonly-owned land. Rather, *Snyder* involved a traditional, straightforward case in which the owner was attempting to establish a purely commercial use in a residential zone.

In *Alviani,* the property at issue was a 1.2 acre parcel located in Anne Arundel County, and split-zoned under the applicable ordinances as C 1–B (community retail) and RLD (residential low density). *Alviani,* 365 Md. at 98, 99, 775 A.2d at 1236. The landowner sought to build an automotive service facility, a use permitted by special exception/variance in the C1–B zone, but prohibited altogether in the RLD zone. *Alviani,* 365 Md. at 99, 775 A.2d at 1236. As a result, the property owner sought to have the RLD portion re-zoned as either C 1–B or C4 (highway commercial), where the facility would be permitted as of right. *Id.* Aside from the fact that the holding in *Alviani* involved principally the appropriateness of granting the requested variances, rather than an issue implicating the special problem of split-zoning, the factual circumstances are entirely dissimilar from the present case. We deal in the present case with a utilization of land ancillary to permitted uses on two parcels within different residential districts with different density limitations. The proposed use in *Alviani* involved placement of a principal use spanning two zoning districts, in one of which the principal use was prohibited.

### C. The Testimony of Paul Solomon

Moreover, Petitioners' argument regarding placement of both the SWM facility and interior access road is based principally upon the testimony of Paul Solomon, a former employee of the Baltimore County Office of Planning and Zoning. Mr. Solomon, according to his credentials, was involved intimately with the creation of the R.C. zones. Mr. Solomon testified before the CBA as an expert witness that, because the primary goal of the R.C. 2 zone was to preserve the land within that zoning district in order to maximize agricultural output, placement in the R.C. 2 zoning district of

infrastructure improvements supporting land located in the R.C. 5 zone was inconsistent with that goal. When pressed on cross-examination, however, Mr. Solomon conceded that there was no specific reference in the BCZR to that effect. Rather, according to him, the conflict between the zoning regulations and the placement of the SWM facility in the R.C. 2 zone was "implicit" in that infrastructure may be placed in compliance with the zoning laws only when it is ancillary to a use permitted within that particular zone. The CBA, in rendering its decision affirming the Commissioner, was unpersuaded by, and rejected the testimony of, Mr. Solomon due to his inability to offer legal support for his contention. Because the Commissioner and CBA chose to discount Mr. Solomon's testimony in interpreting the zoning regulations, we defer to their expertise and ability to assess more directly how the witnesses testified.

### IV. We decline to Reach the Issue of Whether the SWM Facility, Under the Circumstances of this Case, is a Governmental Use Exempt From the BCZR Pursuant to *Glascock v. Baltimore County.*

The parties' quarrel moves next to whether, pursuant to *Glascock v. Baltimore County,* 321 Md. 118, 581 A.2d 822 (1990), and its progeny, the SWM facility is a "public improvement" that qualifies as a "public use" exempt from regulation by the BCZR. The debated proposition is that the SWM facility, which is claimed to be an improvement to the Property required by the Baltimore County Code, will be constructed, and conveyed in-fee to the County for the purposes of public maintenance, and thus broadly serves the public by "reduc[ing] as nearly as possible the adverse effects of stormwater runoff and [ ] safeguard[ing] life, limb, property and public welfare." Maryland Code (1982, 2007 Repl.Vol.), Environment Article, § 4–201. Petitioners argue that the SWM facility, regardless of whether it constitutes a "public" or "private" improvement, nevertheless is not a "public facility" exempt from the BCZR because it is a local facility which serves only the run-off from the proposed subdivision, rather

than a regional facility broadly serving a greater public. The Commissioner, CBA and Court of Special Appeals accepted Respondents' argument, concluding that the SWM facility is a "public improvement" which serves the broad purpose of maintaining "the public health, safety, and general welfare by establishing minimum requirements and procedures to control the adverse impacts associated with increased stormwater runoff." Baltimore County Code § 33–4–102. Because we conclude that there are no zoning impediments to the SWM facility, we need not address whether the Commissioner, CBA, and Court of Special Appeals were correct in concluding that the rule annunciated in *Glascock,* under the present circumstances, relieves the SWM facility from the requirements of the BCZR. We are compelled, however, to nevertheless discuss briefly the *Glascock* doctrine and the problems associated with applying it to the facts of the present litigation.

A. **The Rule of *Glascock:* A Local Government, When it Owns, Leases, or Otherwise Controls Property in that Locality and Puts the Property to Public Use, is Not Subject to its Own Zoning Laws, Absent an Explicit Legislative Provision Manifesting an Intent that the Local Government be Subject to those Laws.**

The concept that a local subdivision of State government generally is not subject to its own zoning laws, unless there is an explicit legislative provision which provides otherwise, may be traced in Maryland to *Commissioners of Cambridge v. Henry,* 263 Md. 370, 283 A.2d 415 (1971). In that case, the City of Cambridge sought to build, within city limits, a waterfront public park adjacent to a city-owned public marina. *Henry,* 263 Md. at 371, 283 A.2d at 416. After the permit application was reviewed, approved, and granted by the proper local authorities, several neighboring residents filed, in the Circuit Court for Dorchester County, a complaint aimed at enjoining the proposed construction. *Henry,* 263 Md. at 371–72, 283 A.2d at 416. The waterfront park, according to the neighbors, would violate applicable local zoning ordinances

prohibiting commercial uses in the particular zoning district. *Henry*, 263 Md. at 372, 283 A.2d at 416. Our resolution of the case hinged on the fact that the applicable zoning ordinance provided specifically that, before any statutory right to redress was available through the judicial process, certain issues presented in the case, namely that construction of the park would impose "immediate substantial and irreparable injury" on the neighborhood, needed, in the first instance, to be addressed by the local Board of Appeals. *Henry*, 263 Md. at 373–74, 283 A.2d at 417. Because the claimant failed to follow those statutory procedures, *i.e.*, bringing the complaint first before the Board of Appeals, we concluded that dismissal of the judicial action was appropriate. *Id.* In considered dicta, however, we explained for guidance that, when the appeal came before the Board, the Board would have to consider whether the City should be bound in the first place by its own zoning regulations. *Henry*, 263 Md. at 374, 283 A.2d at 417 ("[G]enerally a governmental body that has enacted a zoning law is not itself bound by that law.") (citing *Nehrbas v. Incorporated Village of Lloyd Harbor*, 2 N.Y.2d 190, 159 N.Y.S.2d 145, 140 N.E.2d 241, 242 (1957)). The reasoning behind this principle was that,

[i]n the very nature of things, a municipality must have the power to select the site of buildings or other structures for the performance of its governmental duties. Accordingly, it necessarily follows, a village is not subject to zoning restrictions in the performance of its governmental, as distinguished from its corporate or proprietary, activities.

*Id.* (quoting *Nehrbas*, 159 N.Y.S.2d 145, 140 N.E.2d at 242).

Six years after *Henry*, we were called upon, in *Mayor and City Council of Baltimore v. State*, 281 Md. 217, 378 A.2d 1326 (1977), to determine whether Baltimore City could enforce against the State the City's zoning, building, and fire codes in order to prevent the construction by the State of a correctional facility on property, within city limits, leased by the State. According to the municipal zoning laws at the time, the owner of any land within the particular zoning district was required, before it could proceed with any plans to convert an existing

structure into a correctional facility, to obtain a specific zoning approval, by ordinance, from the Mayor and Council. *City of Baltimore v. State,* 281 Md. at 223, 378 A.2d at 1329. In holding that the State was not required to obtain such an approval before commencing with its proposed conversion activities, we stated that "it is a basic and long-standing principle of statutory construction that the State is not deemed to be bound by an enactment of the General Assembly unless the enactment specifically names the State or manifests a clear and indisputable intention that the State is to be bound." *Id.* Relying our earlier conclusions in *State v. Milburn,* 9 Gill 105, 118 (1850), which in turn quoted Justice Story, we reasoned that

> "General Acts of the Legislature are meant to regulate and direct the acts and rights of citizens, and in most cases, the reasoning applicable to them applies with very different and often contrary force, to the government itself. It appears to me, therefore, to be a safe rule, founded in the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and undisputable upon the text of the Act."

*City of Baltimore v. State,* 281 Md. at 223–24, 378 A.2d at 1329. Because Maryland Code (1957, 1970 Repl.Vol.), Article 66B, §§ 2.01 to 2.13, the enabling act which granted to the City the power to enact zoning laws, did not manifest an intent that the State be bound by those laws, we concluded that Baltimore City lacked the authority to enforce against the State its zoning ordinances when the land was to be used for the benefit of the general public. *City of Baltimore v. State,* 281 Md. at 223, 224, 378 A.2d at 1329, 1330. In *Board of Child Care of the Baltimore Annual Conference of the Methodist Church, Inc. v. Harker,* we extended this rule to include in the exemption the "State's agencies and instrumentalities." 316 Md. 683, 693, 561 A.2d 219, 224 (1989) ("That the exemption from county zoning regulations accorded to the State under our holding in *City of Baltimore v. State* ... extends to the State's agencies and instrumentalities is entirely manifest.").

Turning to *Glascock v. Baltimore County,* the basis of Respondents' claim that the SWM facility would not be, in any event, subject to the BCZR, we were confronted with a situation where the County, as lessee of land owned by a local volunteer fire company, sought to construct in a Baltimore County resource conservation zone a 620 foot wireless communication tower. 321 Md. 118, 120, 581 A.2d 822, 823 (1990). The communication tower, a use permitted only by special exception in the zone, was intended to be utilized by the County as part of a countrywide governmental communication system serving principally as an emergency response system for the police and fire departments. *Id.* When the County failed to seek the requisite special exception, an adjacent property owner challenged on that basis the County's right to construct the tower. *Id.*

We held that, as a "territorial division[ ] of the State, created and organized for public political purposes connected with the administration of state government, and specially charged with the administration and superintendence of the local affairs of the community," the County enjoyed exemption from its zoning regulations, absent evidence of a contrary intent expressed there, when the proposed use was in furtherance of its governmental, as opposed to corporate or proprietary, functions. *Glascock,* 321 Md. at 122, 581 A.2d at 824 (citations omitted); *see also Pan Am. Health Org. v. Montgomery County,* 338 Md. 214, 226, 657 A.2d 1163, 1169 (1995) ("[T]he common law provides that [the State] is not bound by local zoning ordinances unless the General Assembly clearly indicates a contrary intent. Local governments, as instrumentalities of the State, enjoy this same common-law immunity.") (citations omitted). Thus, we extended the common-law rule from *City of Baltimore v. State,* that a State enjoys governmental immunity from its own, and its municipalities', zoning laws, to include in the exemption the counties as political subdivisions of the State. Based on our belief that "nothing could be more important than the potential savings of life of a police officer or a fire fighter," *Glascock,* 321 Md. at 121, 581 A.2d at 823, and in light of the fact that nothing in the BCZR

or Maryland Code (1987 Repl.Vol.), Article 25A, § 5(X), the grant to Baltimore County of its power to enact zoning laws, evidenced an intent that the County be bound to its own regulations, we concluded that there was no obligation that the County pursue a special exception. *Id.*[35]

### B. The Assertion of Immunity Under *Glascock* in This Case is Problematic.

The Circuit Court pointed out that the determination of whether an improvement to the development site required by the subdivision regulations constitutes a "public use" immune from the BCZR under the *Glascock* doctrine is governed not only by whether the facility is owned and operated by the government, but also whether its use is "important in carrying out a government function." *See Glascock,* 321 Md. at 120, 581 A.2d at 823 (indicating the importance of adequate emergency communication equipment to public safety). The intermediate appellate court agreed with the relevant principles of

---

**35.** This holding is not inconsistent with *Mayor & Aldermen of Annapolis v. Anne Arundel County,* 271 Md. 265, 316 A.2d 807 (1974). In that case, the Anne Arundel County government owned land located within the City of Annapolis' historic district. When the County filed an application to demolish the historically-designated building, the City and its Historic District Commission filed a complaint for injunctive relief in order to prevent the County from carrying out its plans. *Mayor & Aldermen of Annapolis,* 271 Md. at 273, 316 A.2d at 812. The County argued that it was subject neither to the Annapolis historic district zoning regulations nor the jurisdiction of the City's Historic District Commission. In the course of ruling in favor of the City, we placed emphasis on the distinction between traditional and historic district zoning. Despite the general rule, regarding traditional zoning, that the County would not be subject to the laws of the political subdivision, we observed that, in terms of historic district zoning, the General Assembly manifested explicitly an intent, by virtue of Chapter 274 of the Acts of 1963, that any political subdivision which owned land within a municipal historic district be subject to the jurisdiction of that municipality's historic district commission. *Mayor & Aldermen of Annapolis,* 271 Md. at 291, 316 A.2d at 820. Also persuasive was the fact that the City of Annapolis and Anne Arundel County had subjected themselves to their own respective zoning laws. *Mayor & Aldermen of Annapolis,* 271 Md. at 290, 316 A.2d at 820; *see also* Annapolis City Code § 22-5; Anne Arundel County Code § 13-334A.

law identified by the Circuit Court, but disagreed with their application to the facts of this case.

There are two primary problems with applying *Glascock* to the present case. First is the problem with ownership of the SWM facility at the time the exemption determination was sought and made. We are unable to locate a Maryland case in which a private developer/landowner asserted successfully such an exemption from zoning laws. In the cases in which a the *Glascock*-type exemption was asserted successfully, the proponent, the "developer" if you will, was a governmental entity seeking to develop land which it owned or otherwise controlled at the time it proposed the establishment of the provocative use, facility, or structure. *Compare Henry*, 263 Md. at 371, 283 A.2d at 416 (proposed construction by the City of a waterfront public park on land adjacent to a city-owned public marina); *City of Baltimore*, 281 Md. at 223, 378 A.2d at 1329 (proposed construction by the State of a correctional facility on property leased by the State); *Glascock*, 321 Md. at 120, 581 A.2d at 823 (proposed construction by Baltimore County of a fire and police emergency communication tower on land leased by the County from the local volunteer fire department) *with Harker*, 316 Md. at 688, 561 A.2d at 222 ("[N]o exemption exist[s] 'from local zoning for privately owned land used by private organizations for functions governmental in nature' [when a non-profit corporation is providing child shelter services subject to governmental regulation]"); *Pan Amer. Health Org. v. Montgomery County*, 338 Md. 214, 223, 657 A.2d 1163, 1167 (1995) (" [T]he word 'government' [in the common law principle espoused in *City of Baltimore* and *Glascock*] refers only to the State of Maryland and its instrumentalities, not to all levels of government. [The] [Pan American Health Organization, a regional office of the World Health Organization,] is not part of and does not derive its existence from the State of Maryland."); *Cassidy v. Baltimore County Board of Appeals*, 218 Md. 418, 431–32, 146 A.2d 896, 903 (1958) (distinguishing between "private undertakings" and undertakings "clothed with a public interest," and concluding that a special exception was warranted under

the circumstances, thereby obviating the need to determine whether a privately owned public utility ("BGE") was given preferential treatment by the local government); *Creative Country Day School of Sandy Spring, Inc. v. Montgomery County Board of Appeals*, 242 Md. 552, 219 A.2d 789 (1966) (distinguishing between public, private non-parochial, and private parochial secondary schools, and determining that it was not unreasonable for the County to require the private non-parochial school to obtain a special exception before building a school in a residential use district while excusing the public and parochial schools from that same requirement).

In the present case, however, private parties are asserting governmental exemption from the zoning laws, proposing to construct improvements on land presently owned and operated by them on the presumption that the proposed infrastructure improvement, upon completion, will be approved by the local government in terms of compliance with local design and operational standards and fee simple title will be accepted by the local government for the purpose of continuing maintenance at some future time.

The underlying purpose of the rule that a governmental entity is immune from its own zoning laws, unless a contrary result is apparent from the words of the laws, when it owns or controls land and uses it in furtherance of some governmental purpose, is premised, at least in part, on the rationale that,

[i]n the very nature of things, a municipality must have the power to select the site of buildings or other structures for the performance of its governmental duties. Accordingly, it necessarily follows, a village is not subject to zoning restrictions in the performance of its governmental, as distinguished from its corporate or proprietary, activities.

*Henry*, 263 Md. at 374, 283 A.2d at 417 (citing *Nehrbas*, 159 N.Y.S.2d 145, 140 N.E.2d at 242). With this principle in mind, in order for the immunity to attach to the proposed SWM facility, the governmental body proposed to receive title to the completed use, facility, or structure must have agreed pro-

spectively (expressly or by operation of law), at a minimum, to accept ownership or control in "advance" or at the time of the determination of exemption.

■ The purpose of requiring proof of the prospective acceptance by the governmental entity qualifying for the exemption of the proposed use, facility, or structure should be obvious. First, approval of the location and intended purpose of the proposed use, facility, or structure on the land use proposal is manifested by acceptance. Further, demonstration of the prospective agreement or requirement that the proposed use, facility, or structure will be owned or controlled by the governmental entity is necessary to foreclose unilateral representations by a private applicant. As we stated in *Waterman,* 357 Md. at 504, 745 A.2d at 1010, the purpose of requiring an acceptance by the local government is to prevent a situation where a developer imposes upon the municipality the responsibility for maintenance and repair for an otherwise private facility merely by designating unilaterally the improvement for public maintenance. *See also Waterman,* 357 Md. at 504 n. 8, 745 A.2d at 1010 n. 8 ("In many instances, it is ultimately to a developer's sales advantage to offer to dedicate to the local government water and sewer facilities, streets, recreational areas or other sites because, if the offer is accepted, the local government, not the future residents of the subdivision, generally will be responsible for maintenance of the facilities. In 'closed subdivisions,' which limit public access, homeowners associations generally are responsible for maintaining such facilities.").[36]

---

**36.** Although *Waterman* involved the distinction between a "dedication" and a "condition to approval of a private use," as opposed to perhaps a conveyance in fee simple, the reasoning behind requiring evidence of prospective governmental acceptance of a dedication is equally applicable to a situation where a particular improvement is intended to be conveyed in fee simple for the same purposes as it would be used otherwise in a dedication or a reservation. Moreover, the same implications arise in that, if evidence of acceptance were not required before a conveyance takes place, any developer may unilaterally place on the local government responsibility for maintenance regardless of the nature of the improvement.

■■■ We could not locate in the record the answer to whether the County requested conveyance of the proposed SWM facility for public maintenance, and therefore required in-fee "dedication," or whether it was Respondents who initiated the proposal that the SWM facility be conveyed to the County.[37,38] In any event, it does not matter at whose behest

---

**37.** Respondents assert that they were required by the County to convey the SWM facility as a public improvement at no cost to the County. Specifically, Respondents point to Baltimore County Code §§ 33–4–110(1), 32–4–302(c)(2)(i) ("The rights-of-way [determined to be necessary and appropriate for the county to accept and maintain the public improvements] shall be conveyed in ... [f]ee Simple"), and 302(c)(3) ("The nature of the conveyance shall be established by the county."), "[o]nce the SWM facility has been completed and accepted, Baltimore County 'shall' take in-fee ownership for public maintenance."

Respondents' argument that all SWM facilities, regardless of the circumstances, are required to be conveyed in-fee to the county for maintenance is contradicted by our reading of Baltimore County Code § 33–4–110(1). Section 33–4–110 reads, in its entirety:

Upon completion and acceptance of the stormwater management devices, practices, or both:

(1) The county shall take in-fee ownership of the stormwater management devices and practices *designated for public maintenance;* and

(2) *For privately maintained stormwater management devices, practices,* or both:

(i) The property owner shall be responsible for maintenance; and

(ii) The property owner's specific maintenance responsibilities shall be detailed in a recorded deed of declaration for maintenance and access.

(emphasis added). Section 33–4–110(1), read in context, indicates clearly that a SWM facility may be maintained either publicly or privately, and that only those SWM management devices and practices *actually designated by the County for public maintenance* are conveyed in-fee and therefore constitute "public improvements." *Compare* Baltimore County Code § 33–4–101(mm) (defining "private improvements" as those improvements which are "required by the county as a condition of development that are not intended to be dedicated to the county.") *with* Baltimore County Code § 32–4–101(nn) (defining "public improvements" as those which are "required by the county as a condition of development that are intended to be dedicated to the county in fee simple or by other interests in title.").

Moreover, while the Court of Special Appeals lumped together streets, drains, sewers, waterlines, sidewalks, gutters, landscaping, streetlights and traffic-control devices, and stormwater management facilities as "public improvements," the Baltimore County Code does not pigeon-hole specific types of improvements as either public or private. Baltimore County Code § 32–4–101(w) (" 'Improvements'

the SWM facility is to be conveyed, because there has been no affirmative indication that the governmental unit charged with maintaining such a SWM facility likely would accept the offer to convey in-fee for the purposes of continuing public maintenance.

To the contrary, a representative of the Department of . Environmental Protection and Resource Management (DEPRM), the governmental unit charged with maintaining public SWM facilities, was present at the CBA hearing at which the development plan was considered. At that time, the DEPRM submitted evidence, based on Baltimore County Code §§ 14–331 to 14–350 (Regulations for the Protection of Water Quality, Streams, Wetlands and Floodplains), §§ 14– 401 to 14–422 (Forest Conservation Regulations), and BCZR 1A01.1.A, indicating some technical discontent with the proposed development plan. At no time did the DEPRM express any sentiment that reasonably could be construed as a willingness to accept or a likelihood of acceptance of the conveyance in-fee to the County of the proposed SWM facility for the purposes of maintenance. In this situation, mere approval by the CBA of the development plan delineating a location and intended purpose of a SWM facility proposed by the private developer does not manifest, by itself, acceptance by the

---

means improvements as determined necessary and appropriate by the county," and includes, *inter alia,* "stormwater management facilities"). In other words, the code neither delineates specifically that SWM facilities necessarily are all public improvements nor describes specifically when "designation," thereby requiring conveyance in-fee by the developer/landowner to the County for public maintenance, must occur.

**38.** It is worth noting that the Court of Special Appeals drew an analogy to Maryland Code (1957, 2003 Repl. Vol), Article 66B, § 14, which denominates in Washington County SWM facilities as "public facilities," and also to the County Codes of Frederick and Anne Arundel counties, which define like facilities as public improvements. We find this analogy inapt, if for no other reason, than that the Baltimore County Code, which governs subdivision approval in the jurisdiction where the land is located, makes specific reference to the possibility of both private and public improvements. *See* Baltimore County Code § 33–4–110; Baltimore County Code § 32–4–101(mm), (nn).

appropriate governmental unit so as to satisfy the government ownership/control requirement for application of *Glascock.*

### V. Placement of the SWM Facility and Access Road in the R.C. 2 Zoned Lot Did Not Constitute a *De Facto* Rezoning of the R.C. 2 Land to the R.C. 5 zone.

Prior to submission of the development plan which ignited the present litigation, Respondents sought to change the zoning of the R.C. 2 portion of the Property to R.C. 5. The justification for this proposed reclassification was that, when the County Council established originally in 1976 the Baltimore County resource conservation zones for the purposes of agricultural resource preservation in the County, the wedge-shaped 3.9 acre tract in the northern parcel was zoned mistakenly as R.C. 2, instead of the intended R.C. 5. In other words, Respondents claimed that the zoning lines were drawn in error, and that the entire northern portion should have been placed in the R.C. 5 zone. The case was heard in public session before the Board of Appeals over two days. Citing the well-settled principle that there is a "strong presumption of correctness of original zoning in comprehensive rezoning and [that] to sustain a piecemeal change in circumstance such as present here, there must be strong evidence of mistake in the original zoning or comprehensive rezoning, or evidence of substantial change in the character of the neighborhood must be produced," *Mayor and Council of Rockville v. Henley,* 268 Md. 469, 472, 302 A.2d 45, 46 (1973); *Heller v. Prince George's County,* 264 Md. 410, 412, 286 A.2d 772, 773 (1972), the Board rendered on 6 May 2002 its opinion that there was insufficient evidence to support Respondents' argument that a "mistake" occurred. It therefore rejected Respondents' request to re-zone the entirety of the Property located north of Sweet Air Road as R.C. 5.

Because we conclude that there are no zoning impediments as a matter of law to the placement on the R.C. 2 zoned land of the SWM facility and access road, and because we defer to the expertise of the Commissioner and CBA in interpreting, on this record, the County's resource conserva-

tion zoning regulations, we conclude that no *de facto* rezoning occurred by approval of the development plan. There arises from the CBA's earlier denial of the "mistake" rezoning application prosecuted by Respondents on evidentiary insufficiency grounds no mandatory inference that reflects adversely upon the subsequent development plan approval. The two cases are not related except as to partial identity of the subject property.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**